**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 2:09-cr-00384-HDM-LRL |
| v. ) | |
| ) | MOTION TO SUPPRESS |
| CHARLES BRESNIHAN, ) | STATEMENTS FOR FIFTH |
| ) | AMENDMENT AND DUE PROCESS |
| Defendant. ) | VIOLATIONS (#37) |
| ) | |

## REPORT & RECOMMENDATION

The defendant, Charles Bresnihan, is under indictment on one count of Conspiracy to Commit Theft of Government Property, in violation of 18 U.S.C. §§ 371 and 641. The matter before the court is Bresnihan's Motion to Suppress Statements for Fifth Amendment and Due Process Violations (#37), in which he contends that his Fifth Amendment and Due Process rights were violated when Department of Labor Special Agents failed to administer *Miranda* warnings prior to interrogating him while he was in de facto custody. Also under submission is the government's Opposition (#39), and defendant's Reply (#42). An evidentiary hearing was held on this issue on February 1, 2010. Having considered the motion, opposition, reply, and the testimony offered at the evidentiary hearing, the court submits this Report and Recommendation.

**THE EVIDENCE**

Based on the testimony adduced at the evidentiary hearing and the exhibits attached to the parties' papers, the court finds the following facts have been established by a preponderance of the evidence. On July 31, 2009, around 5:30 p.m., Department of Labor, Office of Inspector General, Special Agents James Buck and Quentin Heiden went to a veterinary clinic located at 601 Greenway

1  Road in Henderson, Nevada, for the purpose of interviewing Bresnihan regarding his role in the
2  September, 2008 break-in of the U.S. Department of Labor-Mine Safety Health Administration
3  ("MSHA") building located near Boulder City, Nevada.  The agents had received information that
4  Bresnihan would be at the clinic at that hour with his teenage daughters to have a family pet euthanized.
5  The agents parked their unmarked pickup truck in the clinic's parking lot, and waited to catch sight to
6  Bresnihan.  The parking lot was large enough to accommodate only about ten cars, and was located at
7  a busy intersection.  Although they didn't see Bresnihan enter the clinic, one of Bresnihan's daughters,
8  who was aware that law enforcement was looking for her father, approached the agents in the parking
9  lot and asked them to wait to question Bresnihan until after the family had finished its business inside.
10 The agents acquiesced and sat in the truck waiting for the family to exit the clinic.  About thirty minutes
11 later, around the time the clinic closed at 6 p.m., Bresnihan and his daughters left the clinic; the
12 daughters, who appeared to be sad and possibly crying, walked toward their car while Bresnihan walked
13 toward the agents' truck.

14 As Bresnihan approached the truck, the agents displayed their credentials.  Bresnihan asked,
15 "Am I going with you guys today?"  The agents replied, "no."  They told Bresnihan he was not under
16 arrest, but they wanted to speak with him.  Bresnihan said it wasn't a good time, but the agents replied
17 that they wanted to speak with him for a few minutes.  Because it was quite hot out, the agents
18 suggested the interview move to a more comfortable, air-conditioned location, like a Starbucks or
19 McDonald's.  Bresnihan replied, "let's just do this," and the interview took place in the parking lot.
20 During the interview, the agents stood together along side the truck, while Bresnihan stood in front of
21 them, with his back facing the clinic.  The agents wore jeans and either long shirts or sport coats that
22 concealed their side arms.

23 The agents did not advise Bresnihan of his *Miranda* rights.  They began the interview about the
24 MSHA break-in by asking a question to which they knew the answer: "Have you heard about the
25 MSHA office break-in?"  Bresnihan said he had not.  Based on earlier interviews of Bresnihan's co-
26 defendants, the agents knew that Bresnihan was not being truthful.  They informed him that "it is in fact

1   a crime to lie to federal agents." SA Heiden testified that he further told Bresnihan that "being that he
2   was a former MSHA inspector, he was a suspect in our investigation and we received information that
3   he had something to do with it and were looking for his side of the story." SA Heiden also told
4   Bresnihan that he had prepared a binder for prosecution in which Bresnihan was listed as a suspect, and
5   that he had "every intention of presenting it to the United States Attorney's Office for prosecution."
6   Bresnihan "relaxed" and became "more cooperative," agreeing that he knew the co-defendants and may
7   have given them "the idea and the key [to the office]." Similarly, Bresnihan said he "could have"
8   drawn a map of the office. The agents pushed Bresnihan on both equivocations, asking "did you or
9   didn't you?" They again reminded Bresnihan that lying to a federal agent is a federal crime. SA Heiden
10  further testified that the agents told Bresnihan that they had monitored calls between him and his co-
11  defendant, that they had done their homework and they know what happened. Bresnihan confessed his
12  role in the MSHA office break-in and provided more details. At no point during the interview did either
13  agent raise his voice, physically threaten Bresnihan, search or handcuff him, or threaten to arrest him.

14  After Bresnihan confessed his role in the break-in, the agents asked whether he wanted to make
15  a written statement. SA Heiden testified that he told Bresnihan that if he did not write the statement
16  himself, then the agents would. SA Heiden further told Bresnihan that prosecutors "like it" when
17  defendants write their own statements. Bresnihan elected to write a statement. The agents allowed him
18  to sit in the passenger seat of the air-conditioned truck with the door open while he wrote. The agents
19  stepped away from the truck, and milled about checking voicemail and email. When Bresnihan was
20  finished, he shook hands with the agents who thanked him for his cooperation, and walked away. The
21  entire interview lasted between one half-hour to forty-five minutes.

**DISCUSSION**

23  The Fifth Amendment requires suppression of statements made during a custodial interrogation
24  unless the defendant has been apprised of, and validly waives, his rights to silence and/or the presence
25  of an attorney. *Miranda v. Arizona*, 384 U.S. 436 (1966). Interrogation for *Miranda* purposes includes,
26  "any words or actions on the part of police . . . that the police should know are reasonably likely to elicit

3

an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). An individual is in custody for *Miranda* purposes if a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.*

The Ninth Circuit has identified five factors to consider in making the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (*quoting Kim*, 292 F.3d at 974). These considerations are not exhaustive. "[O]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a person would have believed he could freely walk away from the interrogators." *Kim*, 292 F.3d at 974.

The only issue before the court is whether Bresnihan's interrogation was custodial, thereby requiring *Miranda* warnings.[1] There is no dispute that the agents interrogated Bresnihan, insofar as they readily testified to attempting to illicit statements from Bresnihan regarding his role in the break-in. *See Rhode Island v. Innis*, 446 U.S. at 301. Nor is there any dispute that the agents did not Mirandize Bresnihan. Accordingly, if the court finds that Bresnihan was in fact in custody at the time of the interrogation, his incriminating statements must be suppressed.

The first *Bassignani* factor is "the language used to summon the individual." Here, Bresnihan,

---

[1] At the hearing, defendant conceded that there wasn't "anything here that would render the statements involuntary. The focus of this issue is on the lack of *Miranda* warnings."

obviously aware that agents wished to speak to him, voluntarily approached the agents' vehicle after exiting the veterinary clinic. He asked, "Am I going with you guys today?" The agents understood him to be asking whether he was going to be arrested today. They answered, "no." They told him he was not under arrest, but that they wanted to ask him some questions. Because it was hot out, the agents offered him the opportunity to go to a more comfortable, air-conditioned location. This approach hardly rises to the level of ordering or commanding Bresnihan to speak with them. Nor did it communicate that he was not free to walk away from them. *See United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (finding degree to which a defendant has "agreed to accompany officers to the police station or to an interrogation room" important to the determination of whether an interrogation is non-custodial); *see also Bassignani*, 575 F.3d at 884 (finding that an officer's "instruction" that defendant "remove himself from the computer" and go to a conference room for questioning militates against a finding that defendant voluntarily agreed to accompany the officers to the conference room). Nor does the uncontradicted evidence indicate that Bresnihan felt he had no choice but to speak with the agents. Indeed, his reply, "let's just do this," suggests just the opposite, namely, that he chose to speak with the agents right there in the parking lot. The first *Bassignani* factor weighs against a finding of custodial interrogation.

The second factor is "the extent to which the defendant is confronted with evidence of guilt." The Ninth Circuit has found a defendant not in custody when officers "did not attempt to challenge [the defendant's] statements with other 'known facts' suggesting his guilt, they merely asked [him] about the allegations." *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005) (citations omitted). But where an "interrogator adopts an aggressive, coercive, or deceptive tone," *Bassignani*, 575 F.3d at 884, the court has found the defendant to be in custody. Here, Bresnihan was informed that he was a suspect and that the agents had specific information regarding his involvement in the burglary. The agents even showed him a binder that had been prepared for prosecutors. On two occasions when the agents knew Bresnihan was lying to them, they reminded him that it is a crime to lie to federal agents. When Bresnihan responded evasively or vaguely, *e.g.*, that he "may have" or "could have" provided the

1 burglars a map of the burgled office, the agents urged him to clarify whether he in fact "did or didn't"
2 provide such a map.  Clearly the agents' interrogation style was more aggressive than passive.
3 Nevertheless, they did not force-feed Bresnihan a confession or embellish or fabricate evidence to gain
4 a confession, *see United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1997), or otherwise engage in
5 deception.  Everything the agents told Bresnihan was true, including the purpose of the interview.
6 Nevertheless, because Bresnihan surely felt the weight of evidence against him, the court finds that the
7 second *Bassignani* factor weighs in favor of custodial interrogation.

8 The third factor is "the physical surroundings of the interrogation." The interrogation took place
9 in the open air of a public parking lot, outside the agents' truck.  The two agents were alongside the
10 vehicle, while Bresnihan stood a few feet away.  They did not touch or otherwise "handle" him, and
11 they did not surround him.  Bresnihan's daughters and their friends were also in the parking lot.  This
12 is hardly the kind of "police dominated" atmosphere "surrounding the kinds of interrogation at issue
13 in *Miranda* itself" or in subsequent cases in which [the Supreme Court has] applied *Miranda*."
14 *Berkemer v. McCarty*, 468 U.S. 420, 438-439 (1984) (holding "that persons temporarily detained
15 pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*") (citing *Orozco v. Texas*,
16 394 U.S. 324, 325 (1969) (suspect arrested and questioned in his bedroom by four police officers); *see*
17 *also Kim*, 292 F.2d at 977 (finding custodial interrogation where police " temporarily took over
18 complete control of Kim's store, creating 'a police-dominated atmosphere,' in which the police kept
19 Kim physically isolated from two family members who could have provided both moral support and,
20 given her limited English, a more complete understanding of the overall situation"). This *Bassignani*
21 factor clearly weighs against a finding of custodial interrogation.

22 The fourth factor requires the court to assess the "duration of detention."  The interview lasted
23 at most forty-five minutes -- a duration that does not require a finding of custody.  *See e.g. Crawford*,
24 372 F.3d at 1052 (finding interrogation lasting more than an hour was not custodial); *Bassignani,* 575
25 F.3d. at 879 (finding two and half hour interrogation was non-custodial).

26 Turning now to the final factor, the evidence indicates a negligible "degree of pressure applied

to detain" Bresnihan.  As noted, the agents did not surround or hem Bresnihan in while questioning him.  *See e.g. United States v. Lee*, 699 F.2d 466, 469 (9th Cir. 1982) (affirming a finding of custodial interrogation even though agents told defendant he could end the interview any time, where defendant "was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house").  Nor did they display their weapons, raise their voices or threaten Bresnihan should he decide to leave.  The agents told Bresnihan that he was not under arrest and that he was not going to be arrested today; and they offered to go to a more comfortable and air-conditioned location.  Bresnihan was not handcuffed; nor did the agents even physically approach him.  When Bresnihan sat in the agents' air-conditioned truck to write his statement, both agents stepped away from the vehicle to make calls and check email, allowing Bresnihan to write his statement without the specter of physical dominance.  When he was finished, he shook hands with the agents and walked away.  *See Crawford*, 372 F.3d at 1060 ("Being aware of the freedom to depart, and in fact departing, after questioning at a law enforcement office, suggest that the questioning was noncustodial.")  This evidence also weighs against a finding of custodial interrogation.  The court therefore concludes, based on the evidence presented and the totality of the circumstances, that Bresnihan was not in custody at the time of the interrogation by Special Agents Heiden and Buck.  Accordingly, the agents were not required to issue *Miranda* warnings.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Bresnihan's Motion to Suppress Statements for Fifth Amendment and Due Process Violations (#37) should be denied.

DATED this 18th day of February, 2010.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**